IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ANTHONY L. CAMPBELL,
      Plaintiff,

vs.                           Case No. 5:06cv121/MCR/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401 *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act and for Supplemental Security Income benefits ("SSI") under Title XVI of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.     PROCEDURAL HISTORY

This suit involves two applications made under the Act.  On January 12, 2004, Plaintiff applied for DIB under Title II of the Act, 42 U.S.C. §§ 401–34 (Tr. 60–62).  On the same date, Plaintiff applied for SSI based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381–83 (Tr.

222–24).[1]  Plaintiff's applications were denied initially and on reconsideration (Tr. 38–40, 42–44).[2]
On February 24, 2006, following a hearing, an administrative law judge ("ALJ") rendered a decision
in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 12–18).  On
May 4, 2006, the Appeals Council of the Social Security Administration denied Plaintiff's request
for review (Tr. 5–7).  Thus, the decision of the ALJ stands as the final decision of the Commissioner,
subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  This appeal
followed.

II.    FINDINGS OF THE ALJ

        On February 24, 2006, the ALJ made several findings of fact relevant to the issues raised in
this appeal (Tr. 12–18):

   1)    Plaintiff meets the insured status requirements of the Act through December 31,
         2008.

   2)    Plaintiff has not engaged in substantial gainful activity at any time relevant to the
         ALJ's decision (20 C.F.R. § 404.1520(b)).

   3)    Plaintiff has the following severe impairment: status-post right knee replacement (20
         C.F.R. § 404.1520(c)).

   4)    Plaintiff does not have an impairment or combination of impairments that meets or
         medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P,
         Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).

   5)    Plaintiff has the residual functional capacity ("RFC") to perform light work.  His
         pain level would limit him to unskilled work.  He is able to occasionally lift twenty
         pounds and frequently lift ten pounds.  He is able to walk and/or stand for six hours
         in an eight-hour workday, and he is able to sit for the remainder of the eight-hour
         workday.

   6)    Plaintiff is unable to perform any of his past relevant work (20 C.F.R. § 404.1565).

---

[1]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI.
However, separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416).  Therefore,
citations in this report and recommendation should be considered to refer to the appropriate parallel provision.  The same
applies to citations of statutes or regulations found in quoted court decisions.

[2] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on September
28, 2006 (Doc. 13).

7)      Plaintiff was born on July 12, 1960, and was forty-three years old on the alleged disability onset date; thus, he is defined as a younger individual aged 18–44 (20 C.F.R. § 404.1563).

8)      Plaintiff testified that he completed the eleventh grade and he is able to communicate in English (20 C.F.R. § 404.1564).

9)      Transferability of job skills is not material to the determination of disability due to Plaintiff's age (20 C.F.R. § 404.1568).

10)     Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant number in the national economy that Plaintiff can perform (20 C.F.R. §§ 404.1560(c), 404.1566).

11)     Plaintiff has not been under a "disability," as defined in the Act, from December 22, 2003 through February 24, 2006, the date the ALJ's decision (20 C.F.R. § 404.1520(g)).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); see also Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.

2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.     Personal History

Plaintiff testified at a hearing before the ALJ as follows.  He was born on July 12, 1960, was forty-five years old at the time of his hearing, was about six-feet tall, and weighed about 355 pounds (Tr. 22, 27, 59 (birth certificate)).  Plaintiff completed the eleventh grade, and started the twelfth grade, but he did not finish high school and does not have a GED (Tr. 22).  He last worked as a construction and maintenance director in December 2003, where his job duties included installing water and sewer lines, meters, and manholes, and connecting water and sewer lines at lift stations (Tr. 23, 92 (work history report)).  After fifteen years of employment, Plaintiff resigned due to right knee and lifting problems (Tr. 22–23).  Plaintiff has never done any other kind of work (Tr. 23).  He testified that he injured his right knee when he was "getting off [his] tractor [at work]" (Tr. 24).  Plaintiff saw a doctor the next day, but the doctor said "he couldn't find no [sic] injuries" (id.).  Eventually, Plaintiff received treatment for his right knee (id.).  He described his symptoms as including "a lot of pain [and] swelling" (Tr. 25).  His knee would catch and lock-up (id.).  Plaintiff testified that the severe pain bothered him constantly (id.).  He further testified that he received Cortisone shots, a brace, and eventually had surgery on his right knee (id.).  Plaintiff also testified that his right knee was totally replaced (id.).  Additionally, Plaintiff testified that after the surgery his right knee was "coming along and it's healing," but he still experiences daily stiffness and numbness (Tr. 25–26).  Plaintiff testified that he could walk about twenty to thirty feet on a good day, stand about ten to fifteen minutes, and sit for an unspecified amount of time before he has to move around due to "stiffness" (Tr. 26).  Plaintiff also testified that he has had "moderate pain" in his left knee "[f]or years" (id.).  He also had surgery on his left knee (id.).  Plaintiff testified that he

is still receiving treatment for his right knee, but he is no longer seeing a physician for his left knee pain (Tr. 27). He testified that he was having more symptoms in his <u>left knee</u> than in his right knee (*id.*). He also testified that sitting does not affect his left knee (*id.*). Plaintiff noted that he has diabetes (Tr. 28). His blood sugar is around 110 to 150 a day, sometimes higher (*id.*). Plaintiff testified that his diabetes causes some physical problems, including blurry vision and swollen feet and ankles (*id.*). He must elevate his feet to keep them from swelling (Tr. 28). Plaintiff testified that he takes medications to treat his diabetes, but the medications cause side-effects such as drowsiness and fatigue (Tr. 29). Plaintiff also testified that he has numbness in his feet (Tr. 30). Plaintiff stated that on a normal day he does not do any cooking, cleaning, or yard work due to his condition; his wife takes care of these things (*id.*). The ALJ questioned Plaintiff at the hearing. Specifically, the ALJ asked Plaintiff whether he was aware of Steven E. Goodwiller's, M.D., opinion that he could work with some limitations (Tr. 31). Plaintiff said that he was, that he did not discuss the opinion with Dr. Goodwiller, and that he had not returned to Dr. Goodwiller since he rendered this opinion (*id.*). At the hearing, Plaintiff ambulated with a cane (Tr. 32).

On January 12, 2004, Plaintiff completed a DIB application where he reported that he worked steadily until December 22, 2003, and tried to return to work on January 8, 2004, but was only able to work a half-day (Tr. 62). Plaintiff indicated that he did not believe he could return to work within a year (*id.*). Plaintiff also completed a disability report form indicating that his prior employment required, on a daily basis, seven hours of walking; six hours of standing; one hour of writing, sitting, climbing, and crawling; and eight hours of stooping, kneeling, crouching, and handling (Tr. 86). He lifted at most 250 pounds, and he frequently lifted 55 pounds (*id.*).[3] No left knee complaints were indicated.

On January 13, 2004, Plaintiff completed an untitled disability report form (Tr. 138–40). He reported severe pain in his right knee that sometimes runs up his right hip and into his arm and shoulders (Tr. 138). Plaintiff did not report any pain or symptoms in his left knee. He reported that he cannot walk without experiencing pain (*id.*). Plaintiff stated that bending, standing, walking, reaching, sitting, and cold weather caused him to experience pain (*id.*). Plaintiff reported that his

---

[3]"Frequently" means occurring 1/3rd to 2/3rds of an eight-hour workday (cumulative, not continuous).

pain was continuous and lasted all day (*id.*).  He reported that he was taking pain medications, but the medications were not effective (Tr. 139).  He also reported that the medications caused some side-effects, including "skin blistered and also vision getting blurred when in heat or sun too long" (*id.*).  In addition to medication, Plaintiff reported that his condition was being treated by physical therapy (*id.*).  Plaintiff stated that he cannot assist with cooking or meal preparation, his wife sometimes helps him get dressed, he can clean the house at times but experiences pain, he sometimes does the laundry but also experiences pain, he does not go shopping because he cannot walk and stand, he sometimes sleeps only two to three hours a night because he cannot find a comfortable position, he cannot drive long distances or do yard work, he no longer engages in social activities because he cannot walk and has constant knee pain, he cannot care for his grandchildren because of pain and swelling, and he no longer does home maintenance because standing and moving around cause pain (Tr. 139–40).  Plaintiff also reported that he could not return to his prior employment because his knee pain and swelling prevent him from performing work-related tasks (Tr. 140–41).

On April 16, 2004, Plaintiff completed a disability report appeal form and indicated that his condition had changed since he last completed a disability report (Tr. 100).  He reported that his eyesight was blurred more frequently, and his "knees lock and pop, stiffness occur[s] more often, [and] knee weaken[ed] more so it make[s] standing and moving around more painful" (*id.*).  He also indicated that he has numbness and burning in his feet and hands (*id.*).  Further, he reported that he cannot "go places [with his] wife and family because [he] can't do all the walking that [it] involves. [He] don't [sic] help out around the house inside or outside due to pain in knee along [with] swelling and numbness and feeling fatigue[d]" more often (Tr. 104).  He also reported that he can no longer drive or sit for long periods without needing to move around (Tr. 106).

B.    Relevant Medical History

From June 2000 to March 2004, Plaintiff was treated by Albert F. Mapp, M.D., for symptoms related to his diabetes (Tr. 179–97).  In brief, Dr. Mapp's records indicate that Plaintiff's diabetes was being treated by medication and was fairly well controlled (*see, e.g.*, Tr. 179–80, 186, 189, 191).  On one occasion, Dr. Mapp noted that Plaintiff complained of knee pain but was under the care of a specialist for this condition (*see* Tr. 180).  Dr. Mapp encouraged Plaintiff to exercise

and often noted that he was being somewhat noncompliant with his prescribed exercise program (*see, e.g.*, Tr. 179, 181, 183–84, 187, 190, 191, 192, 194–95).

On November 7, 2002, Plaintiff presented to James R. Talkington, M.D., complaining of pain in his right knee (Tr. 167–69). Dr. Talkington reported that Plaintiff's symptoms began suddenly on October 21, 2002 (Tr. 167). Plaintiff complained of stiffness, swelling, and decreased range of motion (*id.*). Plaintiff reported pain "diffusely" around the knee without identifying a specific area of discomfort (*id.*). Plaintiff described the pain as "moderate and [] aching" and claimed he sustained a twisting injury at work (*id.*). Dr. Talkington remarked that Plaintiff previously had arthritic complaints "but nothing like this" (*id.*). Dr. Talkington noted that Plaintiff was well developed, well nourished, and appeared to be in good health and "in no acute distress" (Tr. 168). Dr. Talkington reported tenderness "at the general anterior aspect of the [right] knee" and in the "medial joint line – [mid-third]" (*id.*). No swelling, ecchymosis, or skin abrasions were noted (*id.*). Dr. Talkington reported that Plaintiff's right knee range of motion was five degrees extension and ninety degrees flexion (*id.*). The McMurry's and Apley's tests were negative laterally and medially (*id.*). Dr. Talkington reported a negative bounce back hyperextension test and "no pain with medially directed ITB pressure" (*id.*). "Pain on PF compression [was] absent. PF crepitus [was] not present. There [was] a negative apprehension sign" (*id.*). Atrophy, tight lateral retinaculum, lateral tilt, and lateral subluxation were not present (*id.*). Dr. Talkington reported that Plaintiff was able to do a straight leg lift (*id.*). He also reported moderate effusion (*id.*). Dr. Talkington found Plaintiff's right leg essentially normal with no pain (*see id.*). X-rays of the right knee showed DJD of the lateral compartment, DJD of the medial compartment, and DJD of the patello-femoral joint (Tr. 169). Dr. Talkington's impression of the right knee was "DJD Lateral Compartment (715.16), DJD Medial Compartment (715.16), and DJD Patello-femoral Compartment (715.16) . . . Sprain MCL — Grade I (844.1)" (*id.*). Plaintiff also reported to Dr. Talkington that he felt he could "do [a] regular job" (*id.*). Plaintiff was asked to return in two weeks (*id.*).

On February 10, 2003, Plaintiff returned to Dr. Talkington (Tr. 163). Dr. Talkington's impression of the right knee remained unchanged from November 7, 2002 (*see id.*). Dr. Talkington reported that Plaintiff felt he could do a regular job (*id.*). Plaintiff was instructed to return in six months (*id.*).

On April 4, 2003, Plaintiff returned to Dr. Talkington complaining of increased pain (Tr. 160).  Dr. Talkington's examination revealed essentially the same results from his November 2002 examination of Plaintiff, and his impression of Plaintiff's right knee remained unchanged (*see* Tr. 161–62).  He prescribed Bextra and instructed Plaintiff to return in one month (*id.*).

On April 8, 2003, Plaintiff presented to Dr. Talkington complaining of increased pain in his right knee (Tr. 157).  Dr. Talkington remarked that Plaintiff's activity level included normal job duties (*id.*).  His examination and impression of the right knee continued to remain unchanged from Plaintiff's November 7, 2002 visit (*see* Tr. 158–59).  Dr. Talkington prescribed a cane and released Plaintiff to "work [] as outlined by the FCE" (Tr. 159).

On April 24, 2003, Plaintiff presented to PrimeCare in Panama City, Florida for an "FCE" examination by a physical therapist (Tr. 122–37).  The physical therapist found that Plaintiff could perform in the "Medium to Heavy work category as described in the Dictionary of Occupational Titles" (Tr. 122).[4]  Specifically, the physical therapist found that Plaintiff could floor-to-waist lift fifteen pounds continuously, twenty pounds frequently, thirty pounds occasionally, and forty pounds rarely; waist-to-overhead lift fifteen pounds continuously, twenty pounds frequently, twenty-five pounds occasionally, and thirty pounds rarely; front carry fifteen pounds continuously, twenty pounds frequently, forty pounds occasionally, and sixty-five pounds rarely; left-hand carry fifteen pounds continuously, twenty-five pounds frequently, forty-five pounds occasionally, and sixty pounds rarely; and right-hand carry fifteen pounds continuously, twenty-five pounds frequently, forty  pounds occasionally, and sixty-five pounds rarely (Tr. 123).[5]  Plaintiff could continuously

_____

[4]Medium work is defined as:
Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects.  Physical Demand requirements are in excess of those for Light Work.
U.S. Department of Labor, DICTIONARY OF OCCUPATIONAL TITLES, Appx. C at IV(c) (4th ed. 1991) (hereafter "DOT").
Heavy work is defined as:
Exerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 to 20 pounds of force constantly to move objects.  Physical Demand requirements are in excess of those for Medium Work.
*Id.*

[5]The DOT defines occasionally as "activity or condition exists up to 1/3 of the time," frequently as "activity or condition exists from 1/3 to 2/3 of the time," and constantly as "activity or condition exists 2/3 or more of the time." *See* DOT, *supra* note 4, Appx. C at VI(c).

climb ladders or stairs, as well as sit, stand, and ambulate (Tr. 124).  Plaintiff's overhead tolerance and repetitive squatting ability were limited to occasional (Tr. 123–24).  Plaintiff was unable to crouch due to decreased knee range of motion (Tr. 124).  The physical therapist also found Plaintiff's range of motion and muscle strength to be essentially normal, except in his knees where his range of motion was limited to 112 of 135 degrees on the right and 125 of 135 degrees on the left (Tr. 126–28).

On May 21, 2003, Plaintiff returned to Dr. Talkington with complaints of worsening right knee pain (Tr. 154).  Dr. Talkington's notes, findings, and impression were essentially the same as they were in November 2002 (*see* Tr. 155–56).  In addition to these findings, however, Dr. Talkington noted that Plaintiff's left knee was unremarkable with normal range of motion (Tr. 155). Again, Dr. Talkington's impression of the right knee remained the same, and Dr. Talkington made no diagnosis with respect to Plaintiff's left knee (*see* Tr. 156).  Plaintiff was released to "light duty with the following restriction: sedentary position" (*id.*).  Dr. Talkington also commented that surgery was planned if Plaintiff's condition did not improve (*id.*).

On June 24, 2003, Plaintiff again presented to Dr. Talkington (Tr. 151).  Dr. Talkington's notes, findings, and impression remained essentially the same (*see* Tr. 152–53).  Plaintiff's left knee was also noted as normal (Tr. 152).  Dr. Talkington injected a combination of Marcaine, lidocaine, dexamethasone, and triamcinolone into Plaintiff's right knee joint (*see* Tr. 153).  Plaintiff was released to light duty with a sedentary position restriction (*id.*).

On July 8, 2003, Plaintiff returned to Dr. Talkington with right knee complaints (Tr. 148). Again, Dr. Talkington's notes, findings, and impression were essentially the same as those made on November 7, 2002 (*see* Tr. 149–50).  In the "Plan for R[ight] Knee" portion of the report, Dr. Talkington noted that Plaintiff feels he "can do [a] regular job" (Tr. 150).

On October 8, 2003, Plaintiff returned to Dr. Talkington, and he made essentially the same observations, findings, and impression as those made on November 7, 2002 (*see* Tr. 145–47).

Plaintiff's left knee was again unremarkable with normal range of motion (Tr. 146).  Dr. Talkington performed a "synvisc injection"[6] and instructed Plaintiff to return in one week (Tr. 147).

On January 13, 2004, Plaintiff presented to Dr. Talkington complaining of worsening pain in his right knee (Tr. 142).  Dr. Talkington's notes, findings, and impression remained unchanged (*see* Tr. 143–44).  Plaintiff's left knee was again unremarkable with normal range of motion (Tr. 143).  Dr. Talkington reported that Plaintiff felt he could "do [a] regular job" (Tr. 144).  Dr. Talkington administered a "synvisc injection" and asked Plaintiff to return in one week (*id.*).

On January 30, 2004, Plaintiff was examined by an unidentified physician due to complains of heel pain (Tr. 244).  The physician noted that Plaintiff had a recurrence of plantar fasciitis and advised Plaintiff to stretch (*id.*).  Plaintiff was also given medications to be taken as needed (*id.*).

On March 17, 2004, a letter from W.R. McArthur, M.D., to an insurance provider summarized Dr. McArthur's treatment of Plaintiff (Tr. 208–09).  Dr. McArthur reported that Plaintiff injured his knee on October 21, 2002 while at work (Tr. 208). The following day, an examining physician at the Bay Walk-In Clinic noted that Plaintiff had full range of motion, no effusion, and some joint line tenderness (*id.*).  Dr. McArthur reported that the physician's diagnosis was "DJD of the right knee" and that the physician placed him on Vioxx 25 mg daily (*id.*).  X-rays showed degenerative joint disease (*id.*).  Dr. McArthur further reported that in 1993 Plaintiff was treated by Dr. Talkington for degenerative arthritis of the lateral compartment of his right knee with a 40 mg injection of Triamcinolone (*id.*).  The condition worsened and it was recommended that Plaintiff "go to medium to heavy duty" work (*id.*).  On examination, Dr. McArthur noted that Plaintiff ambulates with a cane and has "a very noticeable valgus deformity measuring out about [fifteen] degrees on the right knee" (Tr. 209).  Dr. McArthur also observed that the right knee was greatly swollen as compared to the left (*id.*).  Plaintiff's knee was also mildly tender over the lateral compartment (*id.*).  Plaintiff only had about a fifteen-degree flexion contracture or quadriceps lag

---

[6]According to the U.S. Food and Drug Administration, Synvsic is used "for the treatment of pain in osteoarthritis of the knee in patients who have failed to respond adequately to conservative nonpharmacologic therapy and to simple analgesics, e.g., acetaminophen."  *See* U.S. Food and Drug Admin., Synvisc, CDRH CONSUMER INFORMATION, http://www.fda.gov/cdrh/consumer/synhal.html (Oct. 23, 2003).

and could only flex down to about 90 to 100 degrees (*id.*).  McMurray's testing of the lateral compartment produced pain but not locking (*id.*).  Apley's testing was positive on the right side (*id.*).  X-rays showed "almost a complete collapse of the lateral compartment" (*id.*).  Dr. McArthur noted that Plaintiff "obviously has a medial collapse arthropathy" and opined that Plaintiff would need a varus-unloading brace or a total knee arthroplasty (*id.*).  Dr. McArthur requested that Plaintiff obtain an MRI (*id.*).

On April 7, 2004, a letter from Dr. McArthur to an insurance provider indicates that Plaintiff's MRI showed the absence of the lateral cartilage and some thinning of the lateral compartment (Tr. 207, 210–11 (MRI)).  Further inquiry by Dr. McArthur revealed that Plaintiff had a varus-unloading brace that he does not wear (Tr. 207).  Dr. McArthur prescribed Mobic and indicated that he would "make sure that [Plaintiff's] brace is in good repair" (*id.*).  Dr. McArthur also opined that if Plaintiff kept his symptoms down by using the brace and medication, "he would be released to return to work light to medium duty" with restrictions of "no running, jumping, climbing, squatting, crawling[,] kneeling[,] or heavy lifting" (*id.*).

On April 9, 2004, another letter from Dr. McArthur indicates that Plaintiff was successfully using a "GII unloading brace" but was having problems keeping it suspended (Tr. 206).  Dr. McArthur sent Plaintiff to an orthotist to get a suspension device and opined that "if he is doing okay, I want to send him back to his usual employment" (*id.*).

On May 7, 2004, a letter from Dr. McArthur to an insurance provider indicates that Plaintiff was having intermittent problems with his knee (Tr. 249).  "If he walks too far or if he does too much or squats, he gets swelling and pain in the knee" (*id.*).  Dr. McArthur opined that Plaintiff "gets a little bit of relief using his unloading brace" (*id.*).  Physical examination revealed swelling in the knee but not much effusion (*id.*).  Plaintiff's ligaments were stable but a "little bit tender on the medial side, none around the patella, and some around the lateral side" (*id.*).  Dr. McArthur requested Plaintiff's FCE for review (*id.*).

On September 7, 2004, a letter from Dr. McArthur to an insurance provider explained that Plaintiff's FCE showed "no evidence of symptom magnification" (Tr. 248).  The FCE reported that Plaintiff could do medium work, and Dr. McArthur thought "that this is probably what he should

be told to do at this time" (*id.*).  Still, Dr. McArthur opined that Plaintiff would need a total knee arthroplasty sometime in the not too distant future (*id.*).

On November 15, 2004, another letter from Dr. McArthur to an insurance provider noted that Plaintiff continued to have knee pain and would need a total knee arthroplasty (Tr. 246).

On February 15, 2005, Dr. McArthur reported in a letter to an insurance provider that Plaintiff continued to have pain in his right knee, had problems wearing his unloading brace, and could not obtain a good fit for his unloading brace even with a suspension device (Tr. 245). Examination revealed some effusion and "a rather noticeable valgus deformity of [his right] knee" (*id.*).  Plaintiff's MRIs also showed "severe loss of articular cartilage in the lateral compartment" (*id.*).  Dr. McArthur recommended that Plaintiff be referred to a total joint surgeon to have his right knee replaced (*id.*).  Dr. McArthur opined that Plaintiff would never be able to go back to his prior employment, but a knee replacement would "get rid of his pain" (*id.*).

On March 7, 2005, Plaintiff presented to Dr. Goodwiller for an initial consultation (Tr. 261–62).  Dr. Goodwiller reviewed Plaintiff's treatment history (Tr. 262).  On physical examination, Dr. Goodwiller noted that Plaintiff was an overweight male with "no definite right knee swelling" and mild global tenderness (*id.*).  No effusion was noted (*id.*).  Motion of the right knee was observed at zero to 100 degrees (*id.*).  His ligament was grossly stable, and there was mild patello-femoral crepitus and a faint dorsalis pedis pulse (*id.*).  Mild edema of the right leg and knee were also present (*id.*).  X-rays showed "complete loss of the lateral joint space; also moderate patello-femoral arthritic change and mild increased valgus" (Tr. 261).  Mild joint space arthritic change was present, and only a mild joint space was maintained (*id.*).  Dr. Goodwiller's impression was "[e]nd-stage DJD right knee" (*id.*).  Dr. Goodwiller recommended that Plaintiff proceed with a total knee replacement.

On April 20, 2005, Plaintiff presented to Michael X. Rohan, M.D., for a second opinion regarding total knee replacement surgery (Tr. 250).  Dr. Rohan briefly recounted Plaintiff's treatment history with Drs. Talkington and McArthur (*id.*).  On examination, Dr. Rohan found that Plaintiff was a "very large male in no acute distress" (*id.*).  Plaintiff had zero to 90 degrees of motion in both knees (*id.*).  His right knee was two centimeters larger than his left knee but was not unstable (*id.*).  Very minimal chondromalacia changes were noted (*id.*).  A dorsalis pedis pulse was faint but

present (*id.*).  Straight leg raising and hip motion were not painful (*id.*).  Dr. Rohan diagnosed "[p]re-existing osteoarthritis left knee" and "[a]ggravation of prior existing osteoarthritis secondary to work accident" (*id.*).  Dr. Rohan recommended a total knee arthroplasty (*id.*).

On May 25, 2005, Kamel H. Elzawahry, M.D., performed a neurological examination of Plaintiff (Tr. 251–52).  The examination revealed preserved motor and sensory function and no reflex changes (Tr. 251).

In June 2005, Plaintiff was treated by Amir Manzoor, M.D., for symptoms related to his diabetes (Tr. 254–55).  Samir Yassin, M.D., who had been treating Plaintiff for diabetes from February 2005 to October 2005, referred Plaintiff to Dr. Manzoor (Tr. 263–79).  Dr. Yassin noted that Plaintiff had bilateral knee pain but did not treat him for knee-related symptoms (*see* Tr. 269).

On June 14, 2005, Dr. Goodwiller reported that he performed a total knee arthroplasty on Plaintiff (Tr. 260).

On June 23, 2005, Plaintiff presented to Dr. Goodwiller for follow-up (*id.*).  He noted Plaintiff's right knee was mildly swollen, had zero to 90 degrees range of motion, and his calf was non-tender (*id.*).  X-rays revealed adequate alignment of the implants (*id.*).  Plaintiff was sent home with a walker, a prescription for Percocet and Fragmin, and was directed to finish his prescriptions and then to use "baby Aspirin" daily (*id.*).

On July 14, 2005, Plaintiff returned to Dr. Goodwiller who noted that his right knee wound had healed, there was mild swelling, and his right knee had a range of motion of zero to 100 degrees (Tr. 259).  X-rays showed no signs of loosening (*id.*).  Dr. Goodwiller noted that the plan was for Plaintiff to progress to weight bearing (*id.*).  He was taken off his walker and prescribed a cane (*see id.*).  Dr. Goodwiller advised Plaintiff that he would most likely be unable to return to maintenance-type work and that he should "pursue getting his GED and retaining [] light employment" (*id.*).  Dr. Goodwiller also remarked that Plaintiff was doing fairly well (*id.*).

On August 11, 2005, Plaintiff presented to Dr. Goodwiller for follow-up (Tr. 258).  His right knee had mild swelling, no effusion, zero to 95 degrees range of motion, his calf was non-tender, and a Homan's test was negative (*id.*).  Dr. Goodwiller noted that Plaintiff was to finish out his therapy (*id.*).  He also prescribed Percocet (*id.*).  Following Plaintiff's next checkup, Dr. Goodwiller opined that "he should be able to resume light duty work; however he has not worked in about two

years and has no job to go to when approved to resume work" (*id.*).  Plaintiff was ordered to continue one Aspirin a day for another month (*id.*).

On September 8, 2005, Plaintiff presented to Dr. Goodwiller for follow-up (Tr. 257).  Dr. Goodwiller noted that Plaintiff was doing well but was still using a cane to ambulate (*id.*).  Plaintiff's right knee had a zero to 95 degrees range of motion, and his left knee had a zero to 100 degrees range of motion (*id.*).  No extensor lag was noted (*id.*).  Dr. Goodwiller noted that the physical therapist had requested another four weeks but only with sessions twice a week (*id.*).  After that, Dr. Goodwiller opined that Plaintiff should be able to go to a home exercise program (*id.*).  "From the standpoint of his knee[,] he could work with no bending, stooping, climbing[,] or prolonged standing" (*id.*).  Dr. Goodwiller also opined that Plaintiff could progress away from using a cane (*id.*).

C.     Other Information Within Plaintiff's Claim File

David Guttman, M.D., completed a Physical RFC Assessment on May 28, 2004 (Tr. 212–19).  Dr. Guttman opined that Plaintiff was able to lift or carry fifty pounds occasionally and twenty-five pounds frequently; he could sit, stand, or walk six hours in an eight-hour workday (Tr. 213).  His ability to push or pull was unlimited (*id.*).  Plaintiff was occasionally able to climb ramps or stairs, but never able to climb ladders, ropes, or scaffolds; frequently able to balance, stoop, or crouch; and never able to kneel or crawl (Tr. 214).  No manipulative, visual, communicative, or environmental limitations were established (Tr. 215–16).

N.L. Kopitnik, D.O., J.D., completed a Physical RFC Assessment on March 28, 2006 (Tr. 198–205).  He opined that Plaintiff was able to frequently lift or carry ten pounds; occasionally lift or carry twenty pounds; and he could stand, walk, or sit six hours in an eight-hour workday (Tr. 199).  His ability to push or pull was unlimited (*id.*).  Plaintiff was occasionally able to climb, balance, stoop, kneel, crouch, and crawl (Tr. 200).  No manipulative, visual, communicative, or environmental limitations were established (Tr. 201–02).

V.     DISCUSSION

Plaintiff raises two issues on appeal.  First, Plaintiff argues that the ALJ failed to give proper weight to his subjective complaints of pain (Doc. 26 at 9–11).  Second, Plaintiff argues that the ALJ

committed reversible error by failing to obtain the testimony of a vocational expert ("VE") in light of the exertional and non-exertional limitations noted by Plaintiff's physicians (*id.* at 11–13).

      A.      Failure to Apply the Eleventh Circuit Pain Standard

Plaintiff argues that the ALJ erred by failing to consider his subjective complaints of pain (Doc. 26 at 9–11).[7]  In response, the Commissioner asserts that the ALJ properly considered Plaintiff's subjective complaints but found them lacking in credibility (Doc. 31 at 4).  Furthermore, the Commissioner argues that the ALJ's determination that Plaintiff could perform the full-range of light work is well supported by the record (*see id.* at 5–7).

As this court is well aware, pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  *Accord* 20 C.F.R. § 416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

---

[7]Plaintiff's brief is of no assistance to this court.  His argument essentially consists of two typed pages of block quotation followed by six sentences of "analysis" (*see* Doc. 26 at 9–11).  On closer examination, the analysis section of Plaintiff's amended brief is merely a summary of the facts in this case (which are already summarized extensively by Plaintiff in an earlier portion of his amended brief) (*see id.* at 3–9).  This court should not be required to create an argument for Plaintiff on the basis of two pages of block quotations.  The undersigned is troubled by the lack of cogent argument presented by Plaintiff.  In essence, Plaintiff's entire argument with respect to the ALJ's evaluation of Plaintiff's pain boils down to one conclusory statement contained only in the heading of Plaintiff's brief: "[t]he Commissioner erred as a mater of law in failing to give proper weight to the pain testimony of [Plaintiff]" (*id.* at 9).  In this regard, for reasons explained *infra*, Plaintiff is simply wrong.

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." Wilson, supra, 284 F.3d at 1226. Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." Elam, 921 F.2d at 1216. The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence." Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)). However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered. Id.; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . . Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." MacGregor, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223. "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court. The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted). The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective

symptoms and complaints").[8]   People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, supra, at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In the instant case, the ALJ concluded that while Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, . . . Plaintiff's statements concerning the intensity, duration[,] and limiting effects of these symptoms is not entirely credible" (Tr. 16).  Initially, the court notes that in analyzing Plaintiff's complaints of pain, the ALJ specifically referenced 20 C.F.R. § 404.1529 (Tr. 15). The ALJ went on to find that "[a]lthough [Plaintiff] reported inability to work due to right knee problems, in April 2004 [Plaintiff] reported using his brace made the knee feel quite good" (Tr. 16).  In June 2005, Plaintiff underwent a total right knee replacement which was "generally successful in relieving [his] symptoms" (Tr. 17).  "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."  Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (quoting Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) (footnote omitted)).

Furthermore, the ALJ found that Dr. McArthur sent Plaintiff back to his usual employment (Tr. 16).  The ALJ also found that Dr. Talkington reported that Plaintiff stated in January 2004 that "his activity level included normal job duties" (Tr. 17).  In addition, after his knee replacement, in October 2005, the ALJ found that Dr. Goodwiller's examination "showed only mild swelling" and that Dr. Goodwiller opined that Plaintiff could work (id.).  In summary, the ALJ noted that "both

---

[8]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

Dr. McArthur and Dr. Goodwiller [] stated [that Plaintiff was] able to work, one before surgery, and the other after surgery" (*id.*). Thus, the ALJ found that, having considered Plaintiff's subjective complaints, he is able to return to "light exertional work" (*id.*).

The medical records are consistent with the findings of the ALJ. Dr. Talkington, Plaintiff's treating physician and an orthopaedic specialist, reported Plaintiff's statements that he could "do [a] regular job" on four separate occasions from November 2002 to June 2004 (*see* Tr. 144, 150, 163, 169). Dr. Talkington also reported that Plaintiff's activity level included normal job duties (*see* Tr. 157). Further, Dr. Talkington consistently released Plaintiff to light duty work with a sedentary position restriction (*see, e.g.*, Tr. 156, 153) and opined that Plaintiff could even perform medium to heavy work to "as outlined by the FCE" (*see* Tr. 159; *see also* Tr. 122–37 (FCE report concluding Plaintiff could perform medium to heavy work)).

Dr. McArthur's opinion also supports the ALJ's determination. Initially, Dr. McArthur found that, based on an examination of Plaintiff, he needed a varus-unloading brace and might eventually require surgery (*see* Tr. 208–09). Then, Dr. McArthur discovered that Plaintiff had a varus-unloading brace that he was not using and opined that if Plaintiff keeps his symptoms down by using the brace and medication, "he would be released to return to work light to medium duty" with restrictions of "no running, jumping, climbing, squatting, crawling[,] kneeling[,] or heavy lifting" (*see* Tr. 207). As provided in the Social Security Regulations, 20 C.F.R. § 404.1530, "In order to get benefits, [an individual] must follow treatment prescribed by [his] physician if this treatment can restore [his] ability to work." *See also* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to the objective medical evidence it is proper for the ALJ to consider Plaintiff's failure to seek treatment). Dr. McArthur consistently opined that Plaintiff could return to light to medium employment, including his prior employment, and after reviewing Plaintiff's FCE results, Dr. McArthur concurred with the evaluation of Plaintiff's FCE, stating that "this is probably what he should be told to do at this time" (*see* Tr. 206–07, 248). Only later did Dr. McArthur opine that Plaintiff needed surgery (*see* Tr. 246), but Dr. McArthur further stated that knee replacement surgery would "get rid of [Plaintiff's] pain" (Tr. 245).

Dr. Goodwiller's records further support the opinions of the other physicians and the ALJ's conclusion. Dr. Goodwiller, Plaintiff's knee surgeon, performed a total right knee arthroplasty on

June 14, 2005 (Tr. 260). Post surgery, Dr. Goodwiller explained that Plaintiff's surgery went well and that he had 95 or 100 degrees range of motion in his right knee (Tr. 257–59). Dr. Goodwiller advised Plaintiff that he would most likely be unable to return to maintenance-type work and that he should "pursue getting his GED and retaining [] light employment" (*id.*). Dr. Goodwiller further opined that Plaintiff "should be able to resume light duty work" (Tr. 258). In Plaintiff's final consultation, Dr. Goodwiller remarked that "[f]rom the standpoint of his knee[,] he could work with no bending, stooping, climbing[,] or prolonged standing" (Tr. 257). Although Plaintiff was using a cane, it was Dr. Goodwiller's opinion that he could progress away from using a cane (*id.*).

The ALJ considered the foregoing evidence during his analysis of Plaintiff's claim of pain (Tr. 15–17). The ALJ found that the objective medical evidence indicates that Plaintiff's condition is not of such severity as to cause the amount of pain and restrictions claimed by Plaintiff (Tr. 16). Accordingly, the ALJ properly discounted Plaintiff's subjective complaints and articulated sufficient reasons, supported by the record, for doing so.

B.      Failure to Obtain a Vocational Expert

Plaintiff argues that the ALJ erred in failing to obtain the testimony of a VE (Doc. 26 at 11–13).[9] In response, the Commissioner asserts that, because the ALJ found that Plaintiff could perform the full range of light work, the testimony of a VE was not necessary (Doc. 31 at 9). The Commissioner further argues that the ALJ correctly determined, that due to Plaintiff's RFC to perform the full range of light work, Plaintiff is not disabled on the basis of the Medical-Vocational Guidelines (*see id.* at 9–10).

Once the ALJ finds that a claimant cannot return to his prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. Foote, 67 F.3d at 1559. In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Id.* at 1558; Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may

---

[9]As before, Plaintiff fails to present any argument in support of his allegation. Plaintiff copied nearly one full page of block quotation from two cases followed by a one-sentence factual statement and the conclusory "argument" that because Plaintiff "has both exertional and non-exertional impairments . . . a vocational experts [sic] testimony is required" (Doc. 26 at 12).

sometimes be met through exclusive reliance on the Medical-Vocational Guidelines, also known as the "grids." Foote, 67 F.3d at 1558. Exclusive reliance on the grids is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e); Foote, 67 F.3d at 1559; Heckler v. Campbell, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, that is, impairments that place limits on an individual's ability to meet job strength requirements).

Exclusive reliance on the grids is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." Walker v. Bowen, 826 F.2d 996, 1002–03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. Foote, 67 F.3d at 1559; Chester v. Bowen, 792 F.2d 129, 132 (11th Cir. 1986); see also MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986) (when nonexertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert). It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. See Allen, 880 F.2d at 1202; Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981), overruled on other grounds.

In this case, the ALJ's use of the grids was proper. First, although use of the grids is inappropriate in cases involving non-exertional impairments, such as pain, see Cowart v. Schweiker, 662 F.2d 731, 736 n.1 (regulations do not apply in cases where claimant alleges nonexertional kinds of impairments), here Plaintiff's allegations of pain were properly discredited by the ALJ. Second, the ALJ found that Plaintiff has the "[RFC] for essentially the full range of light work" (Tr. 18).[10]

---

[10]Light work is defined in 20 C.F.R. § 404.1567(b) as follows:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

RFC is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. *See* Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite his limitations. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the RFC determination is a medical question, it is not based only on "medical" evidence (that is, evidence from medical reports or sources); rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record. *See* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); Dykes v. Apfel, 223 F.3d 865, 866–67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding). *See also* 20 C.F.R. § 404.1545; Social Security Ruling (SSR) 96-8p.

Here, the ALJ's determination that Plaintiff could perform light work is based on the opinions of Drs. Talkington, McArthur, and Goodwiller (*see* Tr. 15–17). Dr. Talkington opined that Plaintiff could do light duty work with a sedentary position restriction (*see, e.g.*, Tr. 156, 153) and even stated that Plaintiff could perform medium to heavy work to "as outlined by the FCE" (*see* Tr. 159; *see also* Tr. 122–37 (FCE report concluding Plaintiff could perform medium to heavy work)).[11] Dr. McArthur also opined that Plaintiff could return to light to medium employment, including his prior employment, and after reviewing Plaintiff's FCE results, Dr. McArthur concurred with the evaluation of Plaintiff's FCE stating that "this is probably what he should be told to do at this time" (*see* Tr. 206–07, 248). Later Dr. McArthur opined that Plaintiff needed surgery and remarked that knee replacement surgery would "get rid of [Plaintiff's] pain" (*see* Tr. 245–46). Dr. Goodwiller,

---

[11]Dr. Talkington rendered his opinion on April 8, 2003, and Plaintiff's FCE examination was not conducted until about two weeks later on April 24, 2003 (*see* Tr. 159, 122–37). Dr. Talkington examined Plaintiff several times after his April 8, 2003 visit, and there is no indication that Dr. Talkington rejected the April 24, 2003 FCE assessment (*see, e.g.*, Tr. 154–56, 151–52, 148–50, 145–47, 143–44). Thus, the fact that the FCE was rendered after Dr. Talkington opined that Plaintiff could return to work as outlined by his FCE is of no consequence. It is evident that Dr. Talkington believed Plaintiff could work with whatever limitations were established in the FCE.

Plaintiff's knee surgeon, advised Plaintiff that he would most likely be unable to return to maintenance-type work, but he should "pursue getting his GED and retaining [] light employment" (*id.*). In Plaintiff's final consultation, Dr. Goodwiller noted that "[f]rom the standpoint of his knee[,] he could work with no bending, stooping, climbing[,] or prolonged standing" (Tr. 257). Although Plaintiff was using a cane, it was Dr. Goodwiller's opinion that he could progress away from using the cane (*id.*). Thus, the opinions of Drs. Talkington, McArthur, and Goodwiller support the ALJ's determination that Plaintiff was able to perform the full range of light work.

Moreover, the ALJ's determination is supported by other evidence in the record, specifically, the post-surgery RFC determination established by Dr. Kopitnik (*see* Tr. 198–205). On March 28, 2006, Dr. Kopitnik found in relevant part that Plaintiff was able to frequently lift or carry ten pounds, occasionally lift or carry twenty pounds; and he could stand, walk, or sit six hours in an eight-hour workday (Tr. 199). His ability to push or pull was unlimited (*id.*). Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 200). Thus, Dr. Kopitnik's opinion supports the ALJ's conclusion that Plaintiff could perform the full range of light work. *See* 20 C.F.R. § 404.1567(b) (defining light work).

Therefore, the ALJ's finding that Plaintiff could perform a full range of light work has substantial support in the record, and because Plaintiff could perform a full range of work at that given level, use of the grids was appropriate. *See* Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985) (grids inappropriate if limitations prevent a wide range of gainful employment at the designated level). Accordingly, the ALJ did not err in his use of the grids.

VI.     CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 22nd day of June 2007.

/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

        Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* **28 U.S.C. § 636;** <u>**United States v. Roberts**</u>**, 858 F.2d 698, 701 (11th Cir. 1988).**